# Richmond.

## LE GRAND'S ADM'R v. FITCH & ALS.

December 4, 1884.

1. FIDUCIARIES—*Liability.*—A fiduciary who has acted in good faith, without an eye to self-interest, and with what men of sense and experience would deem reasonable discretion in their own affairs, is not liable for losses resulting to the trust estate from his acts or omissions, especially during a period of doubts and difficulties like that of the war between the states. *Cooper* v. *Cooper*, 77 Va. 203; *Wayland* v. *Crank, ante* p. 602.

2. *Idem—Case at bar.*—F. died and P. qualified as administrator in October, 1861. His estate consisted of slaves valued at $7,150, other personalty at $1,344, home tract, where his widow and child lived, at $2,500, and another tract unpaid for. He owed about $5,000, to receive which in Confederate currency the creditors showed no willingness. Of the slaves, two were mechanics earning large wages; two were farm hands whose labor would support the family; the rest were women and children. The widow was sensible and energetic, and deemed it wisest that none of the slaves should be sold, but that she should retain all the property and pay by economical management the debt in a reasonable time, and in this P. concurred. She soon paid over to P. $3,000, but he could only pay with it debts to the amount of $1,600. The plan failed. The slaves were emancipated. The currency became valueless. The land had to be sold to pay the debts—P. being charged with *devastavit* in failing to sell some of the slaves to pay the debts—thereby causing loss of the land to the heir.

HELD:

He is not liable.

Appeal from decree of circuit court of Appomattox county, rendered September 20th, 1882, in cause of A. Brown's adminis-

trator against James G. Patterson, administrator of James M. Fitch, deceased, and als., and on cross bill of Charles B. Fitch, sole heir of said J. M. Fitch.

Object of bill was to subject decedent's real estate in the hands of his heir to pay his debts. Object of cross bill was to hold Patterson and his surety, Le Grand, responsible for his *devastavit* charged to have been by him committed in his failure, in 1862, to sell a part of decedent's slaves and pay his debts, they being ample for such purpose, instead of allowing the widow to keep and lose them and the other personalty, thus throwing the burden of those debts on the land in the hands of the heir. Upon hearing, court below decreed in favor of the heir. To which decree Le Grand's administrator appealed. Opinion fully states the case.

*Kirkpatrick & Blackford,* for the appellant.

*Ch. H. Sackett,* for the appellees.

FAUNTLEROY, J., delivered the opinion of the court:

James M. Fitch died in the fall of 1861. J. G. Patterson qualified as his administrator at the October term of Appomattox county court, 1861, and the personal estate was appraised October 29th, 1861, and consisted of slaves valued at $7,150, and other personalty valued at $1,344. The intestate also owned a tract of land worth about $2,500, on which his widow and child resided. The indebtedness of the estate, so far as was made known to the administrator, was small, and the bulk of them being otherwise well secured, were never even presented for payment till after the war ended.

Of the slaves, two were good *mechanics*, whose hires would be very large; two were trained farm hands, whose labor on the farm would easily support the family; and the others consisted of women and young children. The widow considered it best

for her and her child, for whom she was next and dearest friend and natural guardian, that none of these slaves should be sold, and that by wise and economical management all the debts could in a reasonable time be paid, by keeping together the family establishment, and avoiding a sale, which, at that time, the war being flagrant, could have been made only at a great sacrifice, and on credit for Confederate currency. The administrator consented that the arrangement should remain for the time being, and that Mrs. Fitch, the widow, who was an intelligent and energetic woman, should manage the plantation and slaves, and turn over to him the profits and proceeds as realized. During the three remaining years of the war she not only supported her family, but turned over to the administrator upwards of $3,000 in money, of which he used some $1,600 in payment of such debts as could be paid with that money, and had on hand on deposit at the end of the war some $1,500, which could not be used to pay debts, and which perished.

Confederate money became wholly worthless, the slaves were emancipated, and after the war the lands of the intestate were subjected to the payment of his debts. Pending the creditor's suit, the administrator, J. G. Patterson, died insolvent, and the widow having died also, her son, C. B. Fitch, filed his cross bill in this suit, making the administrator and official sureties of Patterson parties, and charging that Patterson had been guilty of a *devastavit* in failing to sell the slaves of his intestate, James M. Fitch's estate, and using the proceeds to pay the debts, and thereby relieve the land. The said cross bill did not charge, and no evidence was produced to show, that any of the debts charged upon the land could have been paid in Confederate money, the only currency for which the slaves could have been sold. On the contrary, it was proved that Brown's administrator, to whom one of the larger debts was due, would not have received the Confederate money; that though the administrator did pay some $1,600 of the debts in Confederate money, there

remained on deposit at the close of the war some $1,500, which, doubtless, would have been paid out if possible ; that the bulk of the debts of the intestate, Fitch, were amply secured without reference to his estate, and that none of these claims were ever pressed till after the war.

On this state of facts the circuit court held, that the administrator had been guilty of a *devastavit;* and it decreed that the heirs of his only solvent surety should pay to the heir of Fitch the whole value of the land sold under decree in the original cause.

We are of opinion, that the course pursued by the administrator of James M. Fitch, under the circumstances, and at the difficult and doubtful juncture of the affairs and administration of the laws of the state which then prevailed, was reasonable and apparently judicious; that there was no apparent necessity for the sale of the slaves of his intestate's estate; and that if they had been sold, the proceeds could only have been collected in Confederate money, with which, the record shows, he could not have paid the debts which are now, only since the war, asserted at all and against the land. The debts were small, compared with the available resources of the estate, and they were not pressed; and the desire of the widow and mother and natural guardian of the plaintiff, then an infant of tender years, was, that there should not be a sale; that the home establishment should not be broken up, and that the estate should be kept together, and the debts paid out of the profits, so as to preserve everything for the heir. This appeared, under the circumstances and at the time, to the administrator, to be reasonable and judicious. If any *devastavit* was committed by this arrangement, and, as we think, hopeful experiment of the administrator, entirely within his proper discretion, it was only as to the personal property, other than the slaves, and inclusive of such personalty as the widow had the right to claim as exempt; and the record shows that in the accounts of the administrator, and

in the payments made by him in the suit of *Brown's Adminis-trator* v. *Fitch,* and to other creditors, both by him and by his sureties, the said personalty of the estate, other than slaves, has been more than accounted for, and the claim of the heir, who is plaintiff in this suit, presents the question by his cross bill whether, under the facts and circumstances of this case, the administrator of James M. Fitch was bound, at his peril and that of his sureties, to sell the slaves of his intestate for Confederate money to pay fiduciary claims, the very existence of which it is not shown that he had knowledge of, and which it is shown by the record he could not have discharged in Confederate currency.

Even if the creditors had duly notified the said administrator of their debts, which they failed to do, most probably because of the existence of the stay law, as well as of their determination not to receive Confederate money, a sale of the slaves by the administrator for Confederate money would have been itself a *devastavit,* unless the creditors should receive it, dollar for dollar, for their claims, and the two large creditors, Abbitt's administrator and Brown's administrator, themselves fiduciaries and representing three-fourths of all the debts, would have committed a *devastavit* if they had received it, and both they and Fitch's administrator would have been held liable to the creditors and legatees of these estates.

It was not the duty of the administrator to sell the slaves or any of them, and the statute forbade the sale of slaves by an administrator unless the other resources of the estate were insufficient for the payment of debts, and in this case there was good prospect that sufficient funds would be realized, by the hires of the mechanics and the farm products of the other slaves' labor, to pay all the debts of the estate in a reasonable time. It was certainly not necessary then, to sell the slaves, and it is not alleged, nor is there any proof in the record, that the administrator had notice of the unpaid debts now asserted

against the land until after the slaves had been emancipated by the war and its results.

At the time of the qualification of the administrator, October 10, 1861, war was flagrant, but it was generally believed that it would be short and that it would end favorably to the cause of the South; up to that time every conflict had been favorable to the Confederate arms. The silence of the creditors shows their unwillingness to receive Confederate currency, which was all that could possibly have been obtained by a sale, and which, by the time a due advertisement of the sale could have been made and the sale effected, even without the usual credit, was greatly depreciated. This administrator acted in stormy and difficult times in perfect good faith, without the slightest view to his own interest, with the purest and best intentions, and with what would be regarded a reasonable discretion by men of good sense and business experience in their own affairs, and having so acted, he cannot, according to the repeated decisions of this court in the numerous cases involving the question of the war and Confederate currency in the action of fiduciaries, be charged with the consequences of a great and disastrous civil war. The loss was unavoidable and inevitable, and it must lie where it fell.

This case is clearly and fully within the principle laid down in *Elliott* v. *Carter*, 9 Gratt. 559, cited with approval in *Davis* v. *Harman*, 21 Gratt. 294, and a long list of cases down to *Cooper et als.* v. *Cooper's Adm'r*, 77 Va. (2 Hansb.) 203; and *Parsley's Adm'r* v. *Martin*, &c., 77 Va. (2 Hansb.) 376. That if the fiduciary has acted in good faith, in the exercise of a fair discretion, and in the same manner in which he would probably have acted if the subject had been his own property, and not held in trust, he will not be held responsible for losses accruing in the management of the trust funds. The rule is the same for *acting* and *omitting to act.*

The administrator was likewise within the operation of the

ordinance of secession, (chap. 42, p. 33,) and Session Acts 1861–2, p. 95–6, suspending all writs, all sales under executions, decrees of court and deeds of trust, and statute of limitations, &c.; and, even without these positive and imperative enactments, he was within the principle embodied in the maxim, " *Inter arma leges silent.*"

The decree of the circuit court complained of is erroneous, and must be reversed and annulled.

DECREE REVERSED.